UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PHILLIP L. KILE, SR. and )
PATRICIA KILE, )
 )
    Plaintiffs, )
 )
 5. ) Case No. 3:04-1069
 ) Judge Echols
INTERNATIONAL TRUCK AND )
ENGINE CORPORATION, )
 )
    Defendant. )

## MEMORANDUM

Pending before the Court is Defendant International Truck and Engine Corporation's ("International Truck") Motion for Summary Judgment (Docket Entry No. 37), to which Plaintiffs have responded in opposition (Docket Entry No. 44) and Defendant has replied (Docket Entry No. 52.) For the following reasons, Defendant's Motion for Summary Judgment will be denied.

This diversity action involving a dispute regarding a real property option agreement was removed to this Court on December 1, 2004. In the Second Amended Complaint, Plaintiffs allege breach of contract, promissory estoppel, negligence and/or intentional misrepresentation, and violation of the Tennessee Consumer Protection Act ("TCPA"). (Docket Entry No. 42 at 5-7.)

### I. FACTS

The facts, construed for present purposes in Plaintiffs' favor, are as follows. These facts will be expanded upon when necessary for purposes of the legal analysis.

1

Plaintiff Philip L. Kile, Sr. ("Kile") is the owner of an International dealership known as Kile International that operated for many years at 711 Murfreesboro Road, Nashville, Tennessee ("711 property"). (Def. SOF ¶ 1.) The property on which the dealership was located was originally rented from the Zimmerman family ("Zimmermans") by way of a lease dated September 8, 1993. (Id. ¶ 2.) The lease term was for a period of five years, with an end date of October 31, 1998. (Id. ¶ 3.)

The Zimmermans had acquired the 711 property from International Truck which was then known as International Harvester Company.[1] (Id. ¶ 5.) The property was conveyed to the Zimmermans by way of a Special Warranty Deed which gave International Truck the option to lease the property under certain conditions ("the Option"). (Id. ¶ 6-7.)

In 1996, Kile and his wife, Patricia Kile, the other Plaintiff in this action, (together "the Kiles"), bought the 711 property from the Zimmermans. (Id. ¶ 4.) The Kiles knew they were acquiring the property subject to the Option. (Id. ¶ 9.)

Kile International is a corporation whose sole shareholder is Kile. (Second Amended Complaint ¶ 2.) Kile International and International Truck agreed that the former would "take over the Nashville location" and would "pick it up 'as is' with all the obligations pro and con." (Def. SOF ¶ 8.)

---

[1] The Zimmermans were a group of investors. A dealership facility which had been constructed by International Harvester was located on the property. (Pf. SOF ¶ 6).

2

After the Kiles bought the property, they became the property's lessor and, with Kile International's consent, increased the rent from $5,450 per month to $15,000 per month. (Id. ¶ 10.) In November 1998, the lease was extended for ten years, until October 31, 2008. (Id. ¶ 11.)

On several occasions, Kile International was deemed in default of the dealership agreement it had with International Truck. In fact, in April 2002 Kile International was informed that its facilities were of insufficient size and did not meet the proper "image" for an International dealership. (Docket Entry No. 47, Ex. 2.)

To cure the alleged defect,[2] Kile decided to build a new dealership.[3] The Kiles owned property on Lebanon Road and broke ground for a new dealership on that property in January 2004. (Def. SOF ¶ 13.) It was intended Kile International would move to the Lebanon Road location when construction was complete. (Id. ¶ 14.)

Kile did not actively market the 711 property after the ground had been broken on the new facility, although he contends he spoke with various brokers about the viability of marketing the land with the option still in place. (Docket Entry No. 47, Kile Decl. ¶¶ 53,

---

[2]Kile International has consistently denied being in default of the Dealer Agreement and communicated that position to International Trucks. (Pf. SOF ¶ 26).

[3]Initially, Kile International spent a great deal of time and effort to attempt to develop a plan to remodel the facility on the 711 property. (Pf. SOF ¶ 19).

3

55-57.) In fact, the 711 property was not actually placed on the market until Kile signed a broker's agreement in January, 2004.

Kile's failure to market the 711 property was due to his belief that the 711 property would not be marketable given the Option possessed by International Truck. Kile made repeated requests to International Truck to release the Option, both before and after the opening of the new facility. (Id. ¶¶ 51-53.)[4]

In an e-mail dated August 29, 2002 to others at International Truck, Steve Koch ("Koch"), Vice President for Sales and Distribution, recounted conversations he had with Kile. In the e-mail, Koch confirmed that Kile International's facility needed "corrective action," and that Kile already had a 12-acre property under option. (Docket Entry No. 47, Ex. 6.) Koch indicated that International Truck agreed to develop a joint performance improvement plan and a facility plan for the new property. As for the release on the old property, Koch wrote "[w]e will release an encumberance [sic] on his property . . . when these plans are complete." (Id.)

Kile and his son met with International Truck representatives in Nashville in December 2002, and informed them they were preparing to invest several million dollars in land and improvements with respect to the new facility. (Pf. SOF ¶¶ 36 & 42.) Kile claims he was told that the lease option would be

---

[4]Kile first asked that the option be released when he purchased the 711 property. This request was refused. (Pf. SOF ¶¶ 9 & 10).

4

released when he began construction of the new facility. (Kile Decl. ¶¶ 36-40.) Nevertheless, the Option was not released until November 2004, after this lawsuit was filed. (Def. Ex. G, Option Release.)

On October 18, 2004, Kile International moved the bulk of its dealership operations[5] to the new facility located on the Kile's Lebanon Road property. (Def. SOF ¶ 12.) With that move, the Kiles agreed that Kile International would not need to continue to pay rent on the 711 property, even though there was still four years remaining on the lease. It was Kile's understanding that International Truck knew that after Kile International moved, it would pay rent only on the new facility. (Kile Decl. ¶77.)

Under the terms of the Option, International Truck had a period of one hundred twenty days from the termination of the lease or the termination of the Dealer Agreement within which to exercise the option. (Pf. SOF ¶ 53.) The one hundred twenty day period would begin to run upon either International Truck's termination of the Dealer Agreement or the termination of the lease between the Kiles and Kile International. (Id. ¶ 54.)

As late as September 13, 2004, International Truck declared an intent to exercise the lease option. (Id. ¶ 57.) This occurred even though International Truck had representatives on site at the

---

[5]Kile International maintained a presence at the 711 property by utilizing the body shop at that location. This was done as an aid to prevent vandalism and to keep the insurance rate lower since the property would not be viewed as unoccupied or vacant. (Kile Decl. ¶ 68).

5

new dealership facility the following day for purposes of approving it for operations as an International dealership. (Id. ¶ 58.)

The release of the lease option was delivered to Kile by International Truck sometime around November 2, 2004. (Id. ¶ 61.) This was months after this lawsuit was filed. (Id. ¶ 62.)

In December 2004, Kile obtained the services of a commercial real estate broker to market the property and executed a listing agreement to that effect in early January, 2005. Together, they agreed that the property should be listed for sale at $1.5 million and that a fair rental rate would be $12,500 per month on a triple net basis. (Pf. SOF, ¶¶ 66-68.)

## II. **STANDARD OF REVIEW**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that

6

there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

Defendant International Truck's motion for summary judgment is very limited in scope. International Truck claims that Plaintiffs cannot prove damages which is an essential element of their claims. Additionally, International Truck makes the somewhat incongruous alternate argument that if Plaintiffs were in fact damaged, said damages were of Plaintiffs' own doing.

"In order to recover for damages, a party must not only prove they have sustained damages, but also that those damages were proximately caused by the act or omissions of the Defendant" and this is so "regardless of the nature of the action." French v. First Union Securities, Inc., 209 F.Supp.2d 818, 825 (M.D. Tenn.

7

2002).[6] International Truck argues that because Plaintiffs made no effort to market the 711 property until the property was released from the Option, only speculation supports Plaintiffs' claims for damages.

In support of its position, Defendant relies upon numerous cases, none of which remotely resemble the situation here. For example, in National Control Corp. v. National Semiconductor Corp., 833 F.2d 491 (3d Cir. 1987), National Control sued National Semiconductor on theories of breach of contract and breach of warranty, claiming that National Semiconductor's failure to timely produce chips resulted in National Control losing a contract for thousands of telephones with MCI. A jury returned a substantial verdict in favor of National Control. The verdict was overturned on appeal because there was no evidence that MCI had even chosen National Control as its supplier or that the failure to buy phones from National Control was anything other than a business decision by MCI not to go forward with the project in the first place. The problem with the verdict was that the jury had to speculate that even without National Semiconductor's breaches, MCI would have proceeded with the project and further that MCI would have chosen National Control as a supplier, even though there was no contract to that effect. Id. at 498.

---

[6]Since this is a diversity action and the alleged breaches and injuries occurred in this state, Tennessee law controls. See Certain Interested Underwriters at Lloyd v. Layne, 26 F.3d 39, 43 (6th Cir. 1996).

8

Apart from stating the well-understood proposition that damages for lost profits may not be based on pure speculation, the National Control case is of no aid to International Truck. The only case cited by International Truck close to this case and of any help is Satterfield v. J.M. Huber Corp., 888 F.Supp. 1567 (N.D. Ga. 1995).

In Satterfield, Plaintiff claimed (among other things) Defendant's manufacturing plant reduced the value of her house and land which were located less than a mile from the plant. Plaintiff produced no witnesses to state they would not be willing to buy her property because of the presence of the plant. In fact, the evidence before the Court suggested the land had appreciated substantially in recent years. Id. at 1573.

Insofar as Plaintiff was unable to point to anyone who was dissuaded from buying her property because of the plant's close proximity, Satterfield is similar but not, as International Truck would have it, "in all material respects indistinguishable from the case at hand." (Docket Entry No. 52, p. 5.) Satterfield is wholly inapposite in one critical respect. In that case, unlike here, there was nothing which would prevent the Plaintiff from selling her land. At most, her claim would be that the plant's presence reduced the value of her land, even though the record before the Satterfield court refuted any such contention.

Here, International Truck held an Option on the 711 property and it cannot seriously be disputed that such an option hampered the property's marketability. As one court has noted:

9

> It is obvious that the presence of a lease/option agreement concerning a parcel of property is an element which enters into giving a saleable or market value to a property. . . . A buyer, confronted with the presence of a lease/option involving a parcel of property which he was interested in purchasing, would certainly take such agreement into account in determining what price he would find acceptable for the parcel desired since any such agreement would affect both the use and future alienability of the property.

Townsend v. Town of Middlebury, 365 A.2d 515, 517 (Conn. 1976).

Kile did not attempt to market the property because of the existence of the Option. That decision cannot be characterized as unreasonable.

Plaintiffs obtained the services of a licensed commercial real estate broker active in the commercial real estate market in Nashville who stated that "in [his] professional opinion, based upon approximately 20 years involved in the business of brokering the buying, selling and leasing [of] commercial real estate, the fact that International refused to release and affirmatively asserted the Option as an encumbrance upon the 711 Property effectively precluded the marketing of the 711 Property for sale or lease." (Docket Entry No. 48, ¶ 13.) In fact, "the lease option was more of an encumbrance than a monetary lien" since a monetary lien could have been satisfied with the payment of money" while the option in this case could only be removed by International Truck. (Id. ¶ 14.)

Contrary to International Truck's position, this Court cannot conclude, as a matter of law, that Plaintiffs cannot establish damages because they did not attempt to market the 711 property

10

when it was determined that Kile International would be moving to the Lebanon Road property.  Plaintiffs' failure to attempt to market the 711 property during the period before the Option's release is not necessarily fatal given that "[t]here is a well-recognized common law maxim that 'the law will not indulge in idle formalities, or do vain or futile acts.'" Spellmeyer v. Tennessee Farmers Mutual Ins. Co., 873 S.W.2d 843, 848 (Tenn. Ct. App. 1993). See also, Borough of Ingram v. Sinicrope, 303 A.2d 855, 858 (Pa. Commw. 1973)("the lack of evidence showing attempts to sell the property is not fatal where, as here, other evidence has established that the land cannot reasonably be used as zoned"). At worst, the question of whether attempting to market the property would have been futile is a question of fact to be resolved at trial.  See Krause v. Bobcat Co., 297 F.Supp.2d 1212, 1215 (D.N.D. 2003)(summary judgment denied where question presented was whether looking for another job would have been futile).

Nor can this Court conclude on the basis of the present record that Plaintiffs cannot establish damages beyond mere speculation. Plaintiffs' real estate broker has confirmed a reasonable basis for damages to the Kiles based upon the loss of rental income on the property because of their inability to lease the property because International Truck continued to assert it priority option to lease and refused to release the option lien.  Even though Plaintiffs may not be able to prove an exact dollar value of damages, this is not required by the law.  "The courts will allow recovery even if it is impossible to prove the exact amount of damages from the breach of

11

contract. Otherwise, in certain instances, the courts would be powerless to help some wronged parties." Walker v. Sidney Gilreath & Associates, 40 S.W.3d 66, 72 (Tenn. Ct. App. 2000).

When the record is construed in Plaintiffs' favor, as it must be for purposes of summary judgment, the evidence suggests that, for reasons not of their own making, Plaintiffs were required to forego money that they otherwise might have garnered were they able to market a piece of property with a clear title. The Court simply cannot conclude the record is so one-sided that the Kiles are not entitled to their day in court.

As a final basis for summary judgment, International Truck asserts Plaintiffs cannot recover because any damages they may have suffered was a result of their allowing Kile International out of the lease. However, under Plaintiffs' theory of the case, which is supported by at least the e-mail from Koch summarizing the meeting between Kile and International, upon the acquisition of new facilities, International Truck would release the Option, making the 711 property marketable. A reasonable inference from the dealings between the parties would be that once the new facilities were finished, Kile International would abandon the lease of the 711 property and take up occupancy in the new facility, a facility which not incidentally was constructed at the behest of International Truck.

By threatening to exercise its option to lease and failing to release its option until November 4, 2004, three months after this lawsuit was filed, International Truck forced the Kiles and their

12

corporate entity, Kile International, on the horns of a dilemma. Kile International could be released from the lease on the old property and begin lease payments on the new facility, or it would be saddled with having to pay two lease payments. Under Plaintiffs' view of the case, International Truck is the one that placed them in this position by failing to follow through on the agreement to release the Option, and International Truck should not benefit from its own wrongful acts. See Jones v. TransOhio Savs. Ass'n., 747 F.2d 1037, 1039 (6th Cir. 1984)("equitable maxim that 'no man may take advantage of his own wrong'").

Since Plaintiffs have evidence supporting the proposition that the new facility was built because of a threatened termination of the dealer agreement, and since there is evidence suggesting that International Truck would release the option so that Kile International could abandon the lease on the 711 property to occupy the new facility, this Court cannot conclude that the damages incurred by Plaintiffs was of their own making. Accordingly, summary judgment will be denied.

## IV. CONCLUSION

On the basis of the foregoing, Defendant International Truck and Engine Corporation's Motion for Summary Judgment (Docket Entry No. 37) will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

13